[L.A. No. 30353. In Bank. Apr. 2, 1975.]

CLAIRE J. GLICKMAN, Plaintiff and Respondent, v.
HILDA P. COLLINS, Defendant and Appellant.

COUNSEL

Fagan, Klugman, Monroe & Edell and Norman Edell for Defendant and Appellant.

Refold & Steiniger and Michael M. Steiniger for Plaintiff and Respondent.

OPINION

**WRIGHT, C. J.**—Defendant Hilda Collins appeals from a judgment in favor of plaintiff Claire Glickman in the sum of $8,852.80 plus attorneys fees and costs found by the court to be due under an agreement wherein defendant guaranteed the obligation of plaintiff's former husband Gerald Glickman to make alimony and child support payments to plaintiff. Defendant contends that the agreement is void as against public policy because it was intended to induce plaintiff to divorce Mr. Glickman. Alternatively she contends that the agreement was without consideration and that plaintiff did not proceed in accordance with applicable suretyship law.

We conclude that the agreement is not void as against public policy, that the guaranty covenant was given for good and valuable consideration and that the record fails to disclose that plaintiff has not proceeded properly against defendant as a surety. We conclude, however, for reasons hereinafter appearing, that the judgment is excessive in one particular respect and modify the same accordingly.

Plaintiff and Gerald Glickman were married on July 27, 1948, and are the parents of two sons. The marriage was not entirely successful and throughout the years there had been a number of separations and reconciliations, one of which progressed as far as the filing of a complaint for divorce in 1963. In August 1966 the Glickmans separated for the last time, plaintiff remaining at the family home in Los Angeles and Mr. Glickman moving to Portland, Oregon. In June of the following year he met defendant and shortly thereafter moved into her home. He thereupon asked plaintiff to obtain a divorce so that he would be free to marry defendant. Accordingly, plaintiff and Mr. Glickman met with plaintiff's attorney in Los Angeles in August 1967 and entered into an

agreement which contemplated that plaintiff would seek to secure a divorce in Nevada. Provisions were also made for the Glickmans' property to be divided and for Mr. Glickman to make monthly support payments to plaintiff over a period of five years.

Plaintiff then moved to Las Vegas and there retained local counsel who prepared a second property settlement agreement which purportedly conformed to the requirements of the Nevada law and some terms of which, including the provisions for child support and custody, differed from those of the original agreement. On September 22 the new agreement was signed by Mr. Glickman in Los Angeles and was returned to plaintiff in Las Vegas for her signature.

While the new property settlement agreement was being drafted, plaintiff became concerned that after the divorce Mr. Glickman would not fulfill his obligations under the agreement. She was particularly concerned over the child support payments as one of the Glickman boys had problems requiring professional medical treatment. She instructed her Nevada attorney to write to defendant and to advise her that plaintiff would not sign the new property settlement agreement or proceed to secure a divorce unless defendant agreed to guarantee the payment of the monthly alimony and child support obligations which would be due from Mr. Glickman. Enclosed with the letter which counsel wrote was an agreement of guaranty. On September 28 defendant signed the agreement and returned it to plaintiff's counsel.

On October 2, after receiving the executed guaranty from defendant, plaintiff signed the property settlement agreement and proceeded to obtain a divorce in Nevada, the same being granted on October 3. Later that same month plaintiff returned to Los Angeles and Mr. Glickman and defendant were married in Oregon. For several months thereafter plaintiff received from Mr. Glickman the monthly payments as specified in the property agreement.

In September 1968 defendant sued Mr. Glickman for divorce which was granted in February 1969. Also in September 1968 Mr. Glickman ceased sending plaintiff any of the payments required to be made under the property settlement agreement. In August 1969 plaintiff obtained a judgment against Mr. Glickman in Los Angeles County in the sum of $8,852.80 which included alimony, child support and medical insurance payments then due under the terms of the property settlement agreement plus attorney's fees and costs. No part of this judgment has been

satisfied. In September of that year plaintiff demanded payment from defendant of the amount of the judgment, and after receiving the latter's refusal filed the instant action in October 1969.[1]

I

Defendant first contends that the guaranty agreement is unenforceable as being contrary to public policy because its effect was to promote the dissolution of the Glickmans' marriage. "Public policy seeks to foster and protect marriage, to encourage parties to live together, and to prevent separation." (*Hill* v. *Hill* (1943) 23 Cal.2d 82, 93 [142 P.2d 417].) Thus we have voided, as promotive of divorce and hence contrary to public policy, a contingent fee agreement between the plaintiff in a divorce action and her attorney. (*Newman* v. *Freitas* (1900) 129 Cal. 283, 289-293 [61 P. 907].) We have likewise voided an agreement between a husband and wife which provided for payment of a specified sum to the wife in release of all property rights in the event of a future divorce if the husband should subsequently give her grounds for such a divorce. (*Pereira* v. *Pereira* (1909) 156 Cal. 1, 4-5 [103 P. 488].)

Notwithstanding the foregoing we have applied a different rule where the marriage relationship had irreparably broken down before the parties entered into a property settlement agreement. We have upheld such an agreement even though the husband would not have signed it absent the wife's promise to obtain a divorce, and the wife would not have obtained the divorce absent the husband's execution of the agreement. (*Hill* v. *Hill, supra,* 23 Cal.2d 82.) We held that "public policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed. [Citation.] In the absence of fraud, collusion or imposition upon the court, public policy does not prevent parties who have separated from entering into a contract disposing of their property rights which shall become effective only in the event one of the parties obtains a divorce, even though such a contract may be a factor in persuading a party who has a good cause for divorce to proceed to establish it." (*Id.,* at p. 93.)

[1]Neither of the parties has addressed the potential choice of law problem in this case, nor has either of them invoked the laws of Nevada or Oregon, even though both of those states may have an interest in the enforceability of defendant's guaranty. Consequently, since both parties have consistently assumed that California law governs, we likewise determine all issues relating to the enforceability of the guaranty according to California law. (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 581 [114 Cal.Rptr. 106, 522 P.2d 666].)

A similar result has been reached not only in cases involving agreements between the two spouses but also in cases of contracts between one of the spouses and a third party. In one such instance the plaintiff wife told her aunt, the defendant, that she had decided to divorce her husband. The defendant, concerned about the adverse social effect of the ensuing publicity, promised the plaintiff that if she would obtain the divorce in Nevada rather than locally she would thereafter support the plaintiff and her children. After obtaining a Nevada divorce, the plaintiff returned to California, lived with her aunt and continued to be supported by her until a quarrel arose several years later. We held the agreement was not contrary to public policy, noting that the plaintiff had had a good cause of action for divorce and had determined to procure such a legal separation prior to the time the defendant had proposed to support the plaintiff and her children upon the condition that she would secure the divorce in Nevada. (*Howard* v. *Adams* (1940) 16 Cal.2d 253 [105 P.2d 971, 130 A.L.R. 1003].)

In a case similar to that now before the court, the defendant had promised the plaintiff, a married woman, that if she would divorce her husband and marry defendant, he would support her and her children and divide his property with her. We again held that public policy did not invalidate their agreement, noting that the objects of the marriage had theretofore been destroyed, that the marriage was beyond saving at the time the defendant made his offer to the plaintiff, that there was little likelihood of reconciliation and that whatever possibility of reconciliation existed was not barred by the offer. (*Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 225 [317 P.2d 613].)[2]

■ In determining whether public policy forbids the enforcement of an agreement "promotive" of the dissolution of a particular marriage, we must look not solely to the terms of the agreement but also to the viability of the marriage in question at the time the contract was entered into. If the marriage had so deteriorated that legitimate grounds for divorce existed and if there was little hope of reconciliation, the

---

[2]*Spellens* refers to the divorce obtained in the circumstances of that case as being "merely incidental to the agreement." The distinction between contracts deemed "promotive of divorce" and those to which divorce is merely "incidental" is of little practical value other than as a means of expressing the legal conclusion that the marriage had so deteriorated prior to the agreement that public policy against the encouragement of divorce is not applicable. "[T]his terminology is not always accurate or descriptive. The validity of such contracts must be determined in the light of the factual background of each case and considerations of public policy appropriate thereto." (*Hill* v. *Hill, supra,* 23 Cal.2d 82, 93.)

dissolution of such a marriage is not contrary to public policy. Divorce is often, in fact, the preferred solution. (*Hull* v. *Superior Court* (1960) 54 Cal.2d 139, 145-147 [5 Cal.Rptr. 1, 352 P.2d 161]; *De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 864 [250 P.2d 598]; *Weil* v. *Weil* (1951) 37 Cal.2d 770, 777 [236 P.2d 159].)[3]

There is no question that, as the trial court found on substantial evidence, the Glickman marriage was beyond redemption in September and October 1967 when the property settlement and the guaranty agreement were executed. The Glickmans had been separated for over a year and one of the parties was living in Los Angeles, the other in Portland, Oregon. For several months Mr. Glickman had been living with another woman, defendant, whom he had informed plaintiff he desired to marry. Unquestionably, plaintiff had ample grounds for divorce under the law then existing in California. The guaranty agreement was of no consequence in the promotion of a legal separation, both spouses having previously decided upon a divorce and plaintiff having already established residence in Nevada for the purpose of initiating such a proceeding. Moreover, plaintiff testified that even if defendant had refused to sign the guaranty and if plaintiff had consequently abandoned the divorce action, she did not plan to effect a reconciliation with Mr. Glickman. Instead she would have remained apart from him and brought an action for separate maintenance or for divorce in a state other than Nevada. Reconciliation was never considered as a serious possibility. Under these circumstances no policy of the State of California would have been served by maintaining this marriage, and the guaranty agreement that facilitated its dissolution was therefore not invalid as against public policy.

## II

Defendant also asserts that the guaranty agreement was unenforceable because there was no consideration for the covenant of guaranty. Although the agreement itself recites that it was given in consideration of the execution by plaintiff of the property settlement agreement with Mr. Glickman, defendant contends that such alleged consideration is insuffi-

---

[3]Although the Family Law Act (Civ. Code, § 4000 et seq.) had not been enacted in 1967 and is not therefore directly relevant to this case, the results expressed herein are consistent with the policy of that legislation. As set forth in the Assembly Committee Report of 1969 Divorce Reform Legislation such policy is to permit dissolution whenever the marriage has irreparably broken down, looking at the marriage as a whole and making the possibility of reconciliation the important issue. (4 Assem. J. (1969 Reg. Sess.) pp. 8054, 8058.)

cient on two grounds. She argues first that since the property settlement agreement was dated September 22 and the guaranty agreement dated September 28, the former cannot be consideration for the latter. She further contends that even if the two agreements had been executed at the same time, plaintiff was already obligated to comply with the terms of the property settlement agreement by virtue of the prior contract between the Glickmans. Therefore, she concludes, there was no new consideration for the execution of the second agreement.

■ Defendant's first contention lacks merit because the dates appearing on the property settlement and guaranty agreements do not accurately reflect the chronology of their execution. After receiving the final property settlement agreement, bearing Mr. Glickman's signature and the date September 22, plaintiff did not immediately sign it. Instead she first instructed her Nevada counsel to prepare and send the guaranty agreement to defendant. Subsequently and only after receiving the guaranty fully executed by defendant did plaintiff accept and sign the property agreement and proceed to obtain the divorce. Thus, contrary to the dates appearing on the faces of the two instruments, the guaranty was actually executed before the property settlement and as part of the same transaction with it. Consequently the two instruments can be treated as if entered into contemporaneously and can serve as consideration for each other. (*Stroud* v. *Thomas* (1903) 139 Cal. 274, 275 [72 P. 1008]; *Pacific States Sav. etc. Co.* v. *Stowell* (1935) 7 Cal.App.2d 280, 281 [46 P.2d 780]; *Citizens Trust etc. Bk.* v. *Bryant* (1921) 53 Cal.App. 735, 736 [200 P. 823].) "Where a suretyship obligation is entered into at the same time with the original obligation, or with the acceptance of the latter by the creditor, and forms with that obligation a part of the consideration to him, no other consideration need exist." (Civ. Code, § 2792; *Citizens Trust etc. Bk.* v. *Bryant, supra,* 53 Cal.App. 735, 736.)

■ Defendant further argues that execution of the second property agreement was insufficient consideration because plaintiff was already bound by the terms of the first property agreement, and there was accordingly no new consideration. This assertion is contradicted, however, by the trial court's implied finding, adequately supported by the record,[4] that there was sufficient new consideration. There was evidence, for example, that Mr. Glickman was obligated in the first

[1] The first property settlement agreement was never actually received in evidence at the trial. Evidence of its general contents was presented orally through the testimony of plaintiff and of Mr. Glickman, and through the deposition of plaintiff's Nevada attorney.

agreement to care for each Glickman boy until he reached age 21; in the second agreement this covenant was replaced by a provision that, if either boy chose to live with plaintiff rather than with his father, Mr. Glickman would make support payments to plaintiff in the amount of $200 per month per child.[5] Also, Mr. Glickman had agreed in the original property agreement to support plaintiff during the pendency of the Nevada divorce proceedings; no such provision appears in the final agreement. Thus, since the obligations of both spouses under the final agreement differed from those under the original one, the new burdens thereby imposed upon plaintiff and the new benefits thereby conferred upon Mr. Glickman furnished sufficient new consideration for defendant's promise to guaranty Mr. Glickman's undertaking. (Civ. Code, § 1605; *Bailey* v. *Breetwor* (1962) 206 Cal.App.2d 287, 292 [23 Cal.Rptr. 740].) In any event, the written guaranty is itself presumptive evidence of consideration (Civ. Code, § 1614; *Pierce* v. *Wright* (1953) 117 Cal.App.2d 718, 723 [256 P.2d 1049]) and defendant has failed to sustain her burden of overcoming this presumption by showing an absence of new consideration in the second property agreement. (Civ. Code, § 1615; *Pierce* v. *Wright, supra,* 117 Cal.App.2d 718, 723.)

Consideration for defendant's guaranty could also be found in plaintiff's statement in the letter to defendant which accompanied the unexecuted guaranty that plaintiff would sign the second property settlement agreement and proceed with the divorce "as soon as" she received the executed guaranty. While the first property agreement between the Glickmans did contemplate that plaintiff would secure a Nevada divorce, it did not obligate her to do so within any particular time limits. Accordingly plaintiff's agreement to institute divorce proceedings promptly upon receipt of the guaranty represented a new consideration running both to Mr. Glickman and to defendant. Mr. Glickman benefited because the sooner the final property agreement was signed and the divorce obtained the less he would have to pay for plaintiff's support pending the divorce and the sooner his obligation to pay five years' alimony would cease. Both Mr. Glickman and defendant benefited because they were able to enter immediately into a valid marriage. Thus plaintiff's prompt execution of the final property agreement and filing for a divorce, bargained for in exchange for the guaranty, conferred sufficient benefit to satisfy the requirements of new consideration.

---

[5]As noted above, it was the performance of these new support payments which most concerned plaintiff and which prompted her to secure the guaranty.

## III

■ We may summarily dispose of defendant's contentions regarding the alleged deficiencies in the manner in which plaintiff proceeded under applicable suretyship law. Defendant's claim that Mr. Glickman fraudulently induced her to sign the guaranty by misrepresenting its legal effect is undermined by the trial court's finding that she understood the "nature, contents, and effect" of the guaranty, a finding adequately supported by the evidence. ■ Moreover, even if Mr. Glickman had deceived her, his actions would not operate to discharge her obligations to plaintiff, an innocent party, who had no notice of his actions and did not participate therein. (*Simon Newman Co.* v. *Tully* (1939) 13 Cal.2d 134, 137-138 [88 P.2d 131].)

■ Defendant also claims that since the guaranty agreement did not encompass Mr. Glickman's obligation to provide medical insurance for plaintiff and the children, plaintiff's attempt to recover such payments in the sum of $252.80 altered the obligation of the principal, Mr. Glickman, so as to discharge defendant as guarantor. (Civ. Code, § 2819.) The provision for medical insurance payments was included, however, in the settlement agreement between the Glickmans, and plaintiff's inclusion of this item in her complaint against defendant in no way altered either defendant's liability or that of the principal. (*Ralston-Purina Co.* v. *Carter* (1962) 210 Cal.App.2d 372, 378 [26 Cal.Rptr. 690].) Thus, defendant is not discharged of her obligation merely by reason of plaintiff's efforts to recover the medical insurance payments from her. It does appear, however, that as she never agreed to guaranty such payments, the judgment against defendant must be reduced by that amount.

■ Defendant's final contention is that plaintiff has failed to pursue her available remedies against Mr. Glickman, the principal debtor, in accordance with a demand made by defendant that she do so. (Civ. Code, § 2845.) The demand was made on January 27, 1970, after the commencement of the instant action. It is clear that prior to that time plaintiff had no duty to pursue Mr. Glickman as defendant's liability for each monthly payment became fixed and unconditional as each payment became due, without regard to plaintiff's remedies against Mr. Glickman. (Civ. Code, § 2807; *Bank of America* v. *McRae* (1947) 81 Cal.App.2d 1, 7 [183 P.2d 385]; *McDonald* v. *Gravenstein etc. Assn.* (1941) 42 Cal.App.2d 329, 332-333 [108 P.2d 936].) Plaintiff nevertheless did attempt to collect from Mr. Glickman before filing the instant suit. She

obtained a judgment against him in 1969 but has been unable to satisfy it. Defendant does not indicate what other remedies she would have plaintiff pursue but in view of Mr. Glickman's impecuniousness it appears that pursuit of any such remedies would be futile. Moreover, defendant remains liable on the guaranty whether or not plaintiff has complied with defendant's demand, for plaintiff's noncompliance would have exonerated defendant in any event only to the extent that she has been prejudiced thereby. (Civ. Code, § 2845.) The record does not demonstrate any such prejudice and defendant is not relieved of liability. (*Ralston-Purina Co.* v. *Carter, supra,* 210 Cal.App.2d 372, 380-381.)

The judgment is modified by striking therefrom the sum of $252.80 and as modified is affirmed. Plaintiff is to recover her costs on appeal.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.